FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

00 AUG 31 AM 9: 14

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| DANIEL WAYNE WRIGHT, individually and as Administrator for the Estate of Donna G. Wright, ]<br><br>Plaintiff, ]<br><br>vs. ]<br><br>HANNA STEEL CORPORATION, et al. ]<br><br>Defendants. ] | CV-99-N-1748-S |

ENTERED
AUG 31 2000

**MEMORANDUM OF OPINION**

## I.   Introduction.

This case is before the court on cross-motions for summary judgment of plaintiff Daniel Wayne Wright (Doc. No. 32)[1] and defendant Hanna Steel Corporation (Doc. No. 36).[2] The motions have been fully briefed and are ripe for decision. Upon due consideration, the plaintiff's motion will be granted; the defendant's motion will be denied; and, judgment will be entered in favor of the plaintiff.

---

[1] Plaintiff's motion to dismiss Counts II, III, IV, and V of his complaint was granted by the court on June 20, 2000. *See* Order (Doc. No. 46). Accordingly, the plaintiff moves for summary judgment on Counts I and VI of his complaint.

[2] A stipulation of dismissal with prejudice was granted as to defendant Blue Cross and Blue Shield of Alabama on June 20, 2000. *See* Order (Doc. No. 47).



II. **Statement of Facts.**[3]

The plaintiff was employed by Hanna Steel from August 6, 1992, until December 31, 1996. In December of 1996, the plaintiff, his wife, Donna Wright, and their two minor children were enrolled in the defendant's group health plan, which was a self-insured plan with claims managed by Blue Cross Blue Shield of Alabama. It is undisputed that Hanna Steel was the plan administrator for the health plan. The plaintiff worked at the Northport plant in Tuscaloosa, Alabama, and Connie Scott provided him and the other employees the information and application for enrollment in the plan during 1996 and 1997. Although Ms. Scott would forward the information to the Fairfield, Alabama, plant, the plaintiff was never instructed to contact any employee at the Fairfield plant regarding the plan.

It is undisputed that the plaintiff voluntarily terminated his employment with the defendant on December 31, 1996, and was not discharged for misconduct. Though Hanna Steel was solely responsible for entering employees' eligibility data on the Blue Cross computer system, it did not cancel the plaintiff's group health plan at the time of his termination. The information entered by Hanna Steel showed that the plaintiff was employed by Hanna Steel from 1996 until June 2, 1998, even though the plaintiff began work for Alabama Windshield on January 1, 1997. Hanna Steel did not supply the plaintiff with a specific notice of rights, obligations, and premium costs for himself, his spouse, and his dependent children who qualified for such continuation of health insurance coverage under

---

[3] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. § 1161, *et seq.*

On January 3, 1997, the plaintiff completed an application to transfer his family's health insurance to the Glass Doctor plan, which covered Alabama Windshield employees and which was also provided through Blue Cross. Sarah Dickinson, the Glass Doctor's employee benefits person, contacted Blue Cross about having the plaintiff and his family placed on the Glass Doctor plan and faxed the plaintiff's application to Blue Cross. However, Blue Cross declined the request to place the plaintiff and his family on the Glass Doctor plan because their records indicated he continued to be covered by the Hanna Steel plan. The plaintiff testified that when he picked up his last check from Hanna Steel he spoke with Ms. Scott about the coverage date for his insurance and she told him that it would have ended on his last day of work. He also asked her to find out what the problem was with his insurance. Movant's evidence (Doc. No. 34) exhibit 6 at 148. It is undisputed that the plaintiff called Ms. Scott and asked her to investigate the circumstances preventing his enrollment in the Glass Doctor plan. Apparently, she assured the plaintiff that she would but never got back in touch with him. Furthermore, the plaintiff states in his affidavit that he and his wife discussed the need to write a letter to Hanna Steel, and that Ms. Wright wrote and mailed a letter to Hanna Steel on March 23, 1997.[4] The plaintiff states that he saw the letter before his wife mailed it, and that he also

> saw the letter ready to be mailed. The letter had our family's return address on it in the left upper corner and it was properly addressed to Hanna Steel

---

[4] The defendant consistently refers to this letter as the May 23, 1997 letter, but the letter is clearly dated March 23, 1997.

- 3 -

> Corporation in Northport, Alabama. In the normal course of business for our home, whenever we put postage on an envelope and lay it out on the kitchen counter, that means it is going to be mailed. The letter was no longer on the kitchen counter when I came home, and it never came back in the mail. My wife made a photocopy of the letter because we were quite concerned about the problems we were having in getting off of Hanna Steel Corporation's insurance.

*Id.* at exhibit 2, ¶ 7. The letter stated that the plaintiff was then attempting to enroll in his new employer's health insurance plan and also stated the date of his termination with Hanna Steel. The letter further explained that Blue Cross had informed the plaintiff that he and his family continued to have coverage under the Hanna Steel plan. Ms. Wright requested that Hanna check its records and get back to her. *Id.,* attachment at exhibit B. The defendant asserts through the declarations of Bobbie Jones and Nicholas Callahan, employees of Hanna Steel, that they have reviewed Hanna Steel's files and have found no correspondence from Ms. Wright. Opponent's evidence (Doc. No. 45) tab 7, ¶ 3 and tab 8, ¶ 3.[5]

The plaintiff worked for Alabama Windshield until October 26, 1997, and then went to work for Johnson Controls.[6] In November of 1997, Donna Wright was diagnosed with Hodgkin's disease. The plaintiff and his wife met with a social worker who contacted Blue Cross and were assured that Ms. Wright had insurance coverage through Blue Cross. Ms. Wright received medical care for her cancer between December of 1997, and June of 1998, costing thousands of dollars.

---

[5] The plaintiff points out that both of these individuals are employed at the Fairfield plant and that their declarations do not state that they looked at the records at the Northport plant, where the letter was sent.

[6] The parties dispute whether Mr. Wright himself was covered under any insurance through Johnson Controls, although there is no dispute that his family was not covered under any health plan of Johnson Controls. As this issue is immaterial to the central issue of defendant's obligation under COBRA, the defendant's motion (Doc. No. 49) to file additional evidentiary materials concerning the existence or absence of plaintiff's insurance coverage with Johnson Controls is denied.

The plaintiff returned to work for Alabama Windshield in February of 1998, and remained there until August 31, 1998. When the plaintiff returned to Alabama Windshield, he again sought to enroll in its health insurance plan through the Glass Doctor. Blue Cross records reflect that on May 7, 1998, Ms. Scott at Hanna Steel made an inquiry concerning the Wrights' insurance coverage. On June 2, 1998, Hanna Steel entered data in its computer system, that was linked with the Blue Cross system, indicating that the plaintiff's employment had terminated on January 1, 1996. That date was incorrect, inasmuch as his employment with Hanna Steel had ended on December 31, 1996. The effect of this entry was to cause Blue Cross to terminate the Wrights' health insurance coverage retroactive to January 1, 1996, creating a gap in coverage from January 1, 1996, until July 1, 1998, and preventing the Wright family from obtaining certificates of creditable coverage for pre-existing condition waiting periods already served. Mr. Wright and his family learned of this retroactive cancellation when they received claims reports from Blue Cross.

The Wright family was covered under the Glass Doctor plan beginning July 1, 1998, but Ms. Wright's cancer was considered a pre-existing condition under the Glass Doctor plan, and Blue Cross refused to pay her claims related to her cancer.

The Wrights retained attorneys in late July of 1998. In October of 1998, plaintiff's counsel notified Hanna Steel that the plaintiff had unpaid medical bills. On October 26, 1998, plaintiff's counsel spoke with Nick Callahan, a Hanna Steel employee. On October 29, 1996, plaintiff's counsel spoke with Mr. Callahan again and discussed resolving the matter. Hanna Steel changed the cancellation date of the Wrights' health plan to June 30, 1998, and paid the Wright family's insurance claims during 1997 and though June 30, 1998.

Further, it is undisputed that the plaintiff paid no premiums for the health insurance coverage received by the plaintiff and his family during this time period. It is also undisputed that the plaintiff never received any notice after his employment termination with Hanna Steel that he was eligible to continue coverage for himself and his family under the group health plan.

The plaintiff filed this action on July 8, 1999, in his capacity as administrator of his wife's estate and in his individual capacity. The plaintiff alleges procedural violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.* and requests the court to award him statutory penalties under the Act, as well as fees for his attorney's.

### III. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in

support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

**IV.    Discussion.**

ERISA was enacted by Congress with the express purpose of providing minimum standards to govern employee benefit plans (including those providing medical and hospital care benefits) and to assure the equitable quality of such plans and provide for

appropriate remedies, sanctions, and ready access to the Federal courts. 29 U.S.C. § 1001, *et seq.* In 1986 Congress amended ERISA to add provisions mandating that qualified beneficiaries who would lose coverage under their ERISA group health plan as the result of a qualifying event be provided the opportunity to elect continuation coverage under the plan. The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), 29 U.S.C. § 1161, *et seq.* The applicable sections of COBRA provide as follows:

> Continuation Coverage and Additional Standards for Group Health Plans
>
> > § 1161. Plans must provide continuation coverage to certain individuals
> >
> > (a) In general. The plan sponsor of each group health plan shall provide, in accordance with this part [29 USCS §§ 1161, et seq.], that each qualified beneficiary *who would lose coverage* under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan. . . .
> >
> > . . .
> >
> > § 1163. Qualifying event
> >
> > For purposes of this part [29 USCS §§ 1161 et seq.], the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part [29 USCS § 1161 et seq.], *would result in the loss of coverage* of a qualified beneficiary:
> >
> > (1) The death of the covered employee.
> > (2) the termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment. . . .

29 U.S.C.S. §§ 1161 and 1163 (emphasis added).

Plaintiff alleges that a qualifying event occurred and that Hannah Steel violated the procedural mandates set forth under COBRA by failing to give him and his family timely COBRA notices. It is undisputed that the plaintiff terminated his employment with the defendant on December 31, 1996, and that no gross misconduct was involved with his termination. The defendant overlooks the fact that a qualifying event occurred in this case and instead attempts to refocus the court's attention by asserting that the "[p]laintiff and his family suffered no loss or gaps in coverage, nor have they been unable to obtain coverage for any pre-existing conditions." Opponent's responsive submission (Doc. No. 44) at 8. The defendant asserts that "it had [no] legal obligation to cancel" the plaintiff's insurance, *id.* at response to undisputed facts, ¶ 15, and continues to maintain that there are no problems with its procedures. For example, Hanna Steel states in its brief that "[t]here is no evidence, however, of any inherent problem with Hanna Steel's procedures. For some unexplained reason, Plaintiff remained on Hanna Steel's insurance rolls for approximately one and one-half years without having to pay any premiums." *Id.* at 9.

The statutory scheme established by COBRA does not in any way suggest that a qualifying event must **actually** result in the loss of benefits in order for plan beneficiaries to be provided the right to elect continuation coverage. *See Communications Workers of America, District One, AFL-CIO v. NYNEX Corp.*, 898 F.2d 887, (2d Cir. 1990). If the statutory scheme were otherwise, then insurance companies would remain in control of the terms on which beneficiaries were entitled to continue their medical coverage. Congress, by enacting COBRA, clearly intended to divest the insurer of this control. The court has no

doubt that the defendant was required to give the plaintiff and his family notice under COBRA upon his termination and that it failed to do so.

The United States Supreme Court has stated that the statute "requires plans to advise beneficiaries of their rights under COBRA both at the commencement of coverage and within 14 days of learning of a qualifying event . . . ." *Geissal v. Moor Medical Corp.*, 524 U.S. 74, 80 (1998). Therefore, since the plaintiff terminated his employment on December 31, 1996, the defendant was required to give him and his family notice under COBRA within fourteen days of that date. *See also*, 29 U.S.C. § 1166(c). Section 1166(c) states that notification "to an individual who is a qualified beneficiary as the spouse of the covered employee shall be treated as notification to all other qualified beneficiaries residing with such spouse at the time such notification is made." Accordingly, to satisfy its obligations to the Wright family under COBRA, the defendant was required to give both the plaintiff and his wife COBRA notices. In addition, after reviewing the case law involving failure to give COBRA notices, the court agrees with the plaintiff that the fact that Hanna Steel provided coverage to the Wright family does not dispense with their statutory duty to provide the continuation notice.

The court may, in its discretion, award the plaintiff $100.00 dollars a day, or such other relief as it deems proper, from the date of the failure or refusal to furnish the required information. 29 U.S.C. § 1132(c). *See Curry v. Contract Fabricators Inc. Profit Sharing Plan*, 891 F.2d 842 (11th Cir. 1990)(wherein the court notes that the fact that the plan eventually paid claimant's retirement benefits and eventually supplied plan documents was not a bar to an award of civil penalties under 29 U.S.C. § 1132(c)). In *Underwood v. Fluor Daniel,*

- 11 -

*Inc.*, No. 95-3036, 1997 WL 33123 (4th Cir. Jan. 28, 1997), the Fourth Circuit noted that even though Mrs. Underwood, a plan beneficiary, knew of her rights under COBRA and had not suffered from any continuing harm as a result of the defendant's failure to provide notice, the defendant was not "absolve[d] . . . [of] its obligation to notify her of them." *Id.* at *4. The court went on to find that section 1132 (c)(1) gives courts considerable discretion in imposing a penalty against a plan administrator for failing to comply with the notice provisions set forth in the COBRA amendments. The court stated:

> This discretion, however, must necessarily be confined to a determination of whether any mitigating circumstances exist to excuse the administrator's inaction. Where, as here, the violation is clear and without excuse, a penalty should be imposed, regardless of whether the plaintiff has been prejudiced. Were it otherwise, the law would not be applied with equal force to all, and justice would not be served.

*Id.* The court also noted that the purpose of the statutory penalty was "'not to compensate participants for injuries, but to punish noncompliance with ERISA,'" and thus, "the amount of the penalty must be sufficient to deter the administrator from future conduct." *Id.* (citations omitted). Accordingly, the court imposed the maximum statutory penalty of $100 per day[7] because the defendant employed a number of people, had not complied with COBRA notice provisions for at least seven years, and had never provided Mrs. Underwood with the required notice. *See also*, *Shade v. Panhandle Motor Service Corp.*, No. 95-1129, 1996 WL 386611 (4th Cir. July 11, 1996) (imposing a penalty of $5 per day up to the date the lawsuit was filed to impress upon the defendant the importance of compliance with COBRA

---

[7] The defendant's liability for the statutory penalty was limited to the one-year limitations period under South Carolina law. *Underwood*, 1997 WL 33123, at *5.

notice requirements but at the same time recognizing that the defendant did not act in bad faith and had already amended its notification procedure).[8]

In *Mlsna v. Unitel Communications, Inc.*, 41 F.3d 1124 (7th Cir. 1994), the Seventh Circuit remanded to the district court for it to determine whether the employee was fired for gross misconduct. If the court were to determine that gross misconduct was not involved, then the court had the discretion to impose another fine[9] and fees after taking into account the good faith of the defendant in asserting the gross misconduct defense. The Middle District of Alabama cited the *Mlsna* decision in finding that the defendant employer was required to provide both the plaintiff and his wife with COBRA notices within 14 days after the plaintiff's termination, regardless of whether they were aware of their COBRA rights. *Brown v. Neely Truck Line, Inc.*, 884 F. Supp. 1534, 1540 (M.D. Ala. 1995). The *Brown* court recognized the dispute over whether the plaintiffs had actually received notice of their COBRA rights even though the defendant maintained that it had mailed the notices. The court found itself confronted with a "classical 'swearing match,'" but ultimately found as a matter of fact that the plaintiffs did not receive notice. The court held:

> By express and unequivocal statutory provisions, the United States Congress has issued a mandate that employers provide qualified beneficiaries with notice setting forth their option to elect continued benefits under a plan following a qualifying event, such as termination of a covered employee. In light of these express provisions, the burden is on the employer to

---

[8] The court also notes that in this case the defendant had not paid the plaintiff's medical expenses and was thus ordered to do so. However, the insurance premiums that the plaintiff would have had to pay under the continuing coverage was subtracted from the total reimbursement. *Shade*, 1996 WL 386611, at *4.

[9] The district court had imposed a fine of $10 per day against the defendant for failing to give notice to the participant's wife. *Mlsna*, 41 F.3d at 1130.

demonstrate that it has implemented a procedure reasonably calculated to effectuate actual notice.

*Id.* at 1541. The court suggested to the defendant that it "assume a more definite and systematic policy to ensure that qualified beneficiaries receive their statutorily prescribed COBRA notice," and assessed damages for each of the plaintiffs at $10 per day, as there was no evidence that the defendant acted in bad faith. *Id.* at 1542.[10]

The *Brown* court referred to *Paris v. F. Korbel & Bros., Inc.*, 751 F. Supp. 834 (N.D. Cal. 1990), in determining the appropriate penalty in that case. In *Paris*, the court determined that lack of prejudice to an ERISA beneficiary does not prevent an assessment of penalties. The court noted that "[a]n administrator's duties under COBRA are not onerous, while the result of non-compliance could be disastrous for the former employee." *Id.* at 839-40.[11] However, good faith and lack of actual harm are mitigating factors in

---

[10] Mrs. Brown's damages were assessed for a fifteen-month period to cover the three-month waiting period for acceptance into the new plan and the one year exclusion for pre-existing conditions. Mr. Brown's damages were calculated from 14 days following his termination to 90 days after he elected coverage under the new plan. The court also included interest compounded annually at a rate of 6.41 percent per annum for each of the sums, denied attorney's fees, and ordered payment of the plaintiff's unpaid medical expenses minus the cost of the premiums plus two percent. *Brown*, 884 F. Supp. at 1542.

[11] The defendant argues that the court should follow the decision of *Kost v. United Parcel Service, Inc.*, No. 95-4144-DES, 1996 WL 459815 (D. Kan. July 11, 1996), in which the court refused to award penalties or attorney's fees. The *Kost* court noted that as soon as the plaintiff notified the defendant that she had not received COBRA notice, the defendant agreed to provide retroactive coverage and waived the COBRA premium for the seventeen-month period. However, the plaintiff rejected the defendant's offer and filed suit. The court noted that the plaintiff did not claim "that she nor any member of her family incurred any uninsured medical expenses during the period she was eligible for COBRA continuation coverage," there was no bad faith on the part of the defendant, and that the defendant actually had a system in place for COBRA rights notification, but in this instance the system had failed. *Id.* at *1. As the plaintiff had suffered no injuries, no prejudice, and had absolutely no damages whatsoever, the court would not grant her a windfall in this case. *Id.* at *3. First, the court finds that the *Kost* case differs from the instant case in that Ms. Wright did incur uninsured medical expenses, and even though the defendant agreed to pay those expenses *after* being contacted by plaintiff's counsel, it is clear that she and the plaintiff suffered some emotional injury after finding out from Blue Cross that she had thousands of unpaid medical bills at a time when she was dying of Hodgkins disease. Second, the court agrees with the reasoning of other courts that although the amount of the penalties may vary based on mitigating factors, the imposition of the penalty itself is warranted in most situations as it is not to compensate beneficiaries for injuries, but to punish noncompliance with the employer's statutory duties.

determining the amount of penalty to assess. Accordingly, the defendant was ordered to pay $10 per day to each beneficiary running up to the date that the defendant finally provided proper notice to the beneficiaries. *Id. See also, Cooper v. Harbour Inns of Baltimore, Inc.*, No. L-98-2173, 2000 WL 351373 (D. Md. Mar. 20, 2000) (ordering defendant to pay penalties of $10 per day, even though defendant rectified its mistake and reinstated plaintiff's insurance, noting that plaintiff was undisputedly upset that her insurance had been terminated and "merely through good fortune . . . did not suffer a more serious illness" during her period of uninsurance).

In the instant case, it is undisputed that the plaintiff and his wife suffered as the result of the defendant's failure to provide COBRA notices, especially when they learned from Blue Cross, not from the defendant, that Ms. Wright's cancer was a preexisting condition that would not be covered by the new insurance, thus resulting in thousands of dollars in unpaid medical bills. In compounding its mistake, the defendant not only retroactively terminated the Wrights' health plan without informing them, but then entered an incorrect date for the termination, January 1, 1996, instead of January 1, 1997, a full year before the plaintiff actually stopped working for the defendant. After canceling their insurance coverage, Hanna Steel never bothered to give the Wright family COBRA notices and, in fact, apparently has not done so to this day, arguing instead that "[b]ecause Plaintiff had no coverage gap, Hanna Steel was not required to give Plaintiff notice of his right to continuation coverage,"[12] and further arguing that it was never legally required to terminate

---

[12] Movant's Initial Submission (Doc. No. 37) at 10. The defendant seems to forget that it did terminate the plaintiff's employment a year earlier than it should have, resulting in a termination of the Wrights' health insurance coverage retroactive to January 1, 1996. The retroactive cancellation created a gap in coverage from January 1,

Mr. Wright's insurance coverage. *See* n. 11. Moreover, there is evidence that the plaintiff and his wife attempted to have Hanna Steel correct its mistake so that they could be covered under the insurance of Mr. Wright's new employer.

Based on the circumstances of this case, the court finds that the appropriate statutory penalty in this case would be $75 per day for eighteen months for both Mr. Wright and Ms. Wright and $10 per day for eighteen months for each of the Wrights' minor children. The defendant states in its amended answer that it is "entitled to an offset for the value of the premium payments Plaintiff did not pay during the time Hanna Steel provided him health insurance coverage . . . ." Amended Answer (Doc. No. 20) at 2. The court agrees. Even though the plaintiff asserts that "[t]he Wrights did not ask the Defendant to provide the group health plan coverage, especially given the fact that the Wrights would have been covered under The Glass Doctor plan," the plaintiff also asserts that "the Wrights most likely would have appreciated the opportunity to obtain COBRA coverage from July 1998 through September 1998." Movant's initial submission (Doc. No. 33) at 19-20. Accordingly, the court finds that the Wright family did indeed receive a benefit from the defendant when it paid their premiums and the defendant is entitled to recover the value of the premiums paid on behalf of the Wright family.[13]

---

1996, until July 1, 1998, preventing the Wright family from obtaining certificates of creditable coverage for pre-existing condition waiting periods already served. The Wrights were forced to hire attorneys to handle the matter, and after the attorneys contacted Hanna Steel, the cancellation date of the Wrights' health plan was finally changed to June 30, 1998, so that the gap in coverage could be removed.

[13]Therefore, the plaintiff's motion (Doc. No. 27) to strike the ninth defense of amended answer of defendant Hanna Steel is denied.

The plaintiff also requests attorney's fees. The Eleventh Circuit has held that the following factors should be considered in determining whether attorney's fees should be awarded:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; (5) the relative merits of the parties' positions.

*Freeman v. Continental Ins. Co.*, 996 F.2d 1116, 1119 (11th Cir. 1993). The court finds that attorney's fees are warranted in this case to a limited extent. The court sees no reason why the defendant would not be able to satisfy an award of attorney's fees and finds that an award would deter the defendant and others from failing to give, or unilaterally deciding that they are under no obligation to give, COBRA notice to a qualified participant or beneficiary.[14] Moreover, it would certainly deter the defendant and others from retroactively canceling a participant's health insurance coverage without notifying them beforehand[15] and from carelessly canceling it an entire year before the employee actually terminated his employment. Although plaintiff's case does not directly benefit plan

---

[14] The defendant continues to maintain that it had no duty or legal obligation to cancel plaintiff's health insurance. Clearly, most employees would be ecstatic for an employer to continue their health coverage after termination and pay their health insurance premiums. However, in such a situation, the employer must inform the employee that it is doing so and will continue to do so or otherwise the employee will correctly assume that he no longer has insurance and will seek to acquire new coverage in most cases. In the instant case, the plaintiff testified that Ms. Scott told him that his insurance would have ended on his last day of work. Accordingly, Mr. Wright sought to acquire new insurance.

[15] The defendant argues that "[c]onsidering that neither Plaintiff nor his family was harmed by the cancellation, the rationale of *Kost, supra,* is applicable to this claim." Opponent's responsive submission (Doc. No. 44) at 10. The court disagrees, finding that the plaintiff and his family were required to endure a period of five months during which time they saw mounting unpaid medical bills with no explanation as to why they had no medical insurance while Ms. Wright was dying of Hodgkins disease.

participants and beneficiaries, it will indirectly benefit them as employers will be more conscious of their duties to their employees and plan beneficiaries under COBRA. As discussed above, the court finds that the plaintiff's claims are meritorious relative to the defendant's position that it has no obligation to the Wright family under COBRA, which is clearly without merit. Finally, the court finds that, despite the defendant's carelessness in providing the Wright family with COBRA notices, or lack thereof, and in retroactively canceling their insurance without notifying them and inserting the wrong date for the cancellation, the defendant's actions do not rise to the level of bad faith in that there is no evidence that these actions were done intentionally or maliciously. The court finds this to be the case in light of the fact that the defendant paid Ms. Wright's unpaid medical bills after being contacted by plaintiff's attorney and did not request reimbursement for premiums paid by the defendant on behalf of the Wright family at that time.

However, the court notes that upon discovering that their health insurance had been canceled without notice and after apparently attempting to remedy the situation with the defendant themselves, the Wrights were forced to hire an attorney. In turn, the attorney obviously had to expend some effort and conduct enough research to determine the defendant's obligations under COBRA. Plaintiff's counsel had to notify Hanna Steel of its error and plaintiff's unpaid medical bills and speak with Hanna Steel employees to resolve the matter. See *Cooper*, 2000 WL 351373, at *7 (awarding limited attorney's fee for requiring plaintiff to consult an attorney who in turn had to conduct research to determine defendants' obligations under COBRA and write a letter to defendants to inform them of their error); *Shade*, 1996 WL 386611, at * 5 (affirming district court's award of attorney's fees

based on factors, including the fact that defendant "must be held accountable for its negligent administration of its group health plan, which rendered Stephens uninsured in the face of substantial medical expenses" and "penalizing [defendant] would deter other ERISA plan administrators from similar activities"). Accordingly, the court finds that the plaintiff is entitled to the attorney's fees incurred in notifying the defendant of its error and seeking reimbursement of the unpaid medical bills resulting from the gap in coverage created by the defendant's retroactive cancellation of the Wrights' health insurance coverage.

An appropriate judgment will be entered contemporaneously with this memorandum of opinion.

Done, this 30th of August, 2000.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE